# EXHIBIT "B"

Wolf Creek Golf Course
Projected Cash Flow From Operations

| ROUNDS PLAYED | 2,003 32,300 | 2,004 33,000 | 2,005 33,500 | 2,006 34,000 | 2,007 34,500 | 2,008 35,000 |
|---|---|---|---|---|---|---|
| Projected Revenues | | | | | | |
| Green fees | 3,931,879 | 4,139,603 | 4,326,302 | 4,522,600 | 4,726,782 | 4,939,145 |
| Golf shop sales | 269,692 | 275,280 | 285,743 | 298,708 | 312,194 | 326,220 |
| Range sales | 16,550 | 17,000 | 17,770 | 18,576 | 19,415 | 20,287 |
| Food & Beverage | 580,909 | 606,042 | 633,681 | 662,433 | 692,340 | 723,445 |
| Gross Income | 4,799,030 | 5,037,925 | 5,263,496 | 5,502,317 | 5,750,731 | 6,009,097 |
| | | | | | | |
| Projected Expenses | | | | | | |
| Golf shop cost of sales | 175,874 | 190,296 | 200,020 | 209,095 | 218,536 | 228,354 |
| Golf shop expenses | 495,424 | 521,595 | 548,410 | 550,830 | 579,622 | 609,853 |
| F & B cost of sales | 190,354 | 200,418 | 211,649 | 221,253 | 231,242 | 241,631 |
| F & B expenses | 380,584 | 401,713 | 400,952 | 385,886 | 408,030 | 431,282 |
| Course maintenance | 1,009,554 | 1,132,554 | 1,143,357 | 1,203,525 | 1,266,701 | 1,333,036 |
| Administrative | 533,780 | 555,519 | 573,040 | 602,520 | 633,473 | 665,975 |
| Marketing | 210,840 | 220,532 | 235,759 | 247,547 | 259,924 | 272,920 |
| Facility maintenance | 54,600 | 57,330 | 60,197 | 63,206 | 66,367 | 69,685 |
| Utilities | 314,000 | 333,900 | 350,595 | 368,125 | 386,531 | 405,858 |
| Taxes & Insurance | 205,800 | 220,840 | 243,432 | 255,604 | 268,384 | 281,803 |
| Total Expenses | 3,570,810 | 3,834,697 | 3,967,411 | 4,107,591 | 4,318,810 | 4,540,397 |
| | | | | | | |
| Net income from Operations | 1,228,220 | 1,203,228 | 1,296,085 | 1,394,726 | 1,431,921 | 1,468,700 |
| | | | | | | |
| Other Expenses | | | | | | |
| Debt reduction | | | | | | |
| Secured Bank Loan | 819,689 | 819,689 | 819,689 | 819,689 | 819,689 | 819,689 |
| Secured Othes (Leases) | 48,932 | 48,932 | 48,932 | 48,932 | 48,932 | 0 |
| Tax Payments | 20,849 | 20,849 | 20,849 | 20,849 | 20,849 | 0 |
| ** Lease Payments | incl above | incl above | incl above | incl above | incl above | incl above |
| *** Class 7 Payments | 29,122 | 0 | 0 | 0 | 0 | 0 |
| **** Class 8 Payments | 157,660 | 157,660 | 157,660 | 157,660 | 157,660 | 157,660 |
| Management fees | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 |
| Total Other Expenses | 1,226,251 | 1,197,130 | 1,197,130 | 1,197,130 | 1,197,130 | 1,127,349 |
| | | | | | | |
| NET CASH FLOW | 1,969 | 6,098 | 98,955 | 197,596 | 234,791 | 341,351 |

\*\*\* Class 7 Payments reflected above is actually Class 8 payments.

\*\*\*\* Class 8 Payments reflected above are actually Class 9 payments.



**EXHIBIT "C"**

Trust and security interests in the Property and other Collateral granted in favor of the Lead Lender (in substantially the same form and with the same content as the Subordination and Standstill Agreement to be executed and delivered in connection with the Unsecured Creditors Committee), and payments on such DIP financing shall be deferred until such time as the Loan is paid in full.

Reserve Account: Borrower shall deposit with Lead Lender the sum of $300,000, to be paid in twelve (12) equal monthly installments of $25,000 until fully funded, to be held by Lead Lender as a Reserve Deposit and applied for the payment of principal and accrued interest thereon or any other sums due and payable under the Loan Documents **only** in the event of a Default by the Borrower. The first $25,000 installment shall be due and payable with the first payment of principal and accrued interest due under the New Loan. The Reserve Account shall bear interest at Lender's money market rates for the benefit of the Borrower.

Other Debt: Borrower must reaffirm or replace any other financing, which is necessary for the operation of the Property (the "Other Debt"), such as equipment financing or leases of the golf carts and irrigation equipment, on or before the Closing.

Collateral: The New Loan shall be secured by a first lien and security interest in all of the Collateral for the Existing Loan. With the exception of the obligations of the Reorganized Debtor to the holders of approved Class 8 and Class 9 Unsecured Claims and the DIP financing (which obligations shall be secured with junior and subordinate deeds of trust pursuant to Subordination and Standstill Agreements in forms and with content acceptable to Lead Lender), there shall be no other encumbrances against the Collateral.

Water Sources: Borrower must secure a primary, and also an alternate source, of water supply for the Property (the "Water Sources") on or before the Closing. The Water Sources must provide for the total amount of water required for the full operation of the Property, as determined by Lender (based upon a third party professional opinion acceptable to Lender, to be provided at Borrower's expense).

Working Capital: Borrower must provide proof to the Lead Lender, before the Closing, that it has sufficient working capital ("Working Capital") necessary for the full operation of the Property.

Borrower Financial: From and after the Closing, Borrower must provide Lead Lender with Balance Sheets, and monthly, quarterly and annual audited financial statements, all as required in the Existing Loan.

Guarantor Financials: Guarantors must provide Lead Lender with current, detailed personal financial statements, along with 3-years of tax returns (the "Guarantor Financial Statements"). The Guarantor Financial Statements must reflect sufficient assets and cash flows necessary to support the repayment of the New Loan.

Proforma Statement: Borrower must provide Lead Lender with a 5-year proforma operating

## First Trust Deed Financing
## Wolf Creek at Paradise Canyon
## (the "Property")
## Mesquite, NV

| | |
|---|---|
| Amount of New Loan: | $10,000,000, consisting of outstanding principal balance under the existing Loan (the "Existing Loan") as of May 30, 2003 of $9,827,065, and interest due on the Existing Loan at the Default Rate equal to $172,935 (the "New Loan"). Payment of the sum of $456,572.68 shall be due and payable at Closing, which sum represents the following: the balance of interest due as of May 30, 2002 in the amount of $103,072.48 (assuming a May 1, 2003 payment of $87,797.41), late charges of $37,976.04, water shares reimbursement $23,310, Lead Lender's attorney fees, $135,000 (estimated), appraisal fees $11,500, property taxes $95,714.16 (assumes no penalty on past due amount), and a documentation and underwriting fee equal to one-half of one percent (.50%) of the New Loan amount ($50,000.00) equal to $50,000. The amendment contemplated hereunder is contingent upon the Debtor making payments of interest only at the Default Rate on the first day of each month until the Closing on the New Loan. |
| Borrower: | The Reorganized Debtor with Douglas C. Clemetson and Cory Clemetson as the principal investors (the "Borrower"). |
| Personal Guarantors: | Douglas C. Clemetson and Judith Clemetson Primm (together known as the "Guarantors") will each personally jointly and severally ratify and reaffirm their existing Guarantees of the Existing Loan, as amended or recast as set forth herein. |
| Lender: | First National Bank, Fulda, MN, as lead lender ("Lead Lender") and the participant lenders in the Existing Loan (together known as the "Lender"). |
| Interest Rate: | Fixed at 8.00% for the first year and thereafter the rate will be reset at the rate set forth in the Note for the Existing Loan, with a floor at 7.0%. |
| Maturity: | The maturity date ("Maturity Date") of the New Loan will be October 1, 2006. |
| Amortization: | The amortization ("Amortization") of the New Loan will be extended to October 1, 2026. |
| Prepayment: | The New Loan may be prepaid in full, or in minimum increments of $500,000 or more, upon (30) days advance written notice, provided that any such prepayment within 24 months shall require a prepayment premium equal to 1% of the then outstanding principal balance due under the Loan, and thereafter no premium shall be charged. |
| DIP Financing: | At or before the Closing, the security interest granted to Mr. Clemetson in the Property in connection the 'Debtor in Possession' ("DIP") financing shall be subordinated to the Deed of |

statement ("Proforma") for the Property, including a detailed cash flow statement and monthly Operating Statements and Balance Sheets.

Management:    The Property is to be managed by professionals experienced in the management of a property of this type. For these purposes McCumber Golf, Linda Moore and other reputable golf course managers would be acceptable golf course management companies.

Payment Method:    Principal and interest payments will be made through ACH transfer.

Customary Items:    The New Loan will require additional, normal and customary loan covenants, including the cove and restrictions set forth in the Existing Loan, real estate closing items including, but not limited surveys, UCC and other searches, Lender's title insurance policy in the amount of the New Loan customary insurance coverages. The payment for all of the foregoing items shall be the responsi of the Borrower. Except as otherwise amended pursuant to the terms set forth in herein, all rema covenants and conditions of the existing Loan Documents shall remain in full force and effect.

Approvals:    This proposal is subject to the approval by the Reorganized Debtor, the Guarantors and the Unit States Bankruptcy Court.

PARADISE CANYON LLC

*Douglas C. Clemetson*

DOUGLAS C. CLEMETSON

*Douglas C. Clemetson*

JUDITH CLEMETSON-PRIMM

statement ("Proforma") for the Property, including a detailed cash flow statement and
monthly Operating Statements and Balance Sheets.

Management:    The Property is to be managed by professionals experienced in the
management of a property of this type. For these purposes McCumber Golf, Linda Moore
and other reputable golf course managers would be acceptable golf course management
companies.

Payment Method:    Principal and interest payments will be made through ACH transfer.

Customary Items:    The New Loan will require additional, normal and customary loan covenants, including the cover
and restrictions set forth in the Existing Loan, real estate closing items including, but not limited
surveys, UCC and other searches, Lender's title insurance policy in the amount of the New Loan,
customary insurance coverages. The payment for all of the foregoing items shall be the responsi
of the Borrower. Except as otherwise amended pursuant to the terms set forth in herein, all remai
covenants and conditions of the existing Loan Documents shall remain in full force and effect.

Approvals:    This proposal is subject to the approval by the Reorganized Debtor, the Guarantors and the Unite
States Bankruptcy Court.

PARADISE CANYON LLC

_____

DOUGLAS C. CLEMETSON

_____

JUDITH CLEMETSON-PRIMM
Judith Primm Clemetson



# EXHIBIT "D"

## SUBORDINATION AND STANDSTILL AGREEMENT

THIS SUBORDINATION AND STANDSTILL AGREEMENT (this "Agreement") made as of the ____ day of March, 2003, by and between the Official Committee of Unsecured Creditors, or its assignee (the "Committee") for and on behalf of those persons and/or entities who are members of the constituency whose interests are represented by the Committee in the proceeding entitled In Re: Paradise Canyon, LLC BK-S-02-17818-LBR (such constituency is hereinafter collectively the "Subordinate Creditors") and First National Bank, a national bank with its principal office located in Fulda, Minnesota (the "Senior Lender").

### RECITALS

A.    Senior Lender is the owner and holder of that certain Promissory Note, dated as of October 3, 2001, of Paradise Canyon LLC, a Nevada limited liability company (the "Borrower") made payable to the order of Senior Lender in the original principal amount of $10,000,000.00 (the "Note") and any extensions, amendments or substitutions thereof being herein collectively referred to as the "Senior Note". The Senior Note and the Loan evidenced thereby are the subject of that certain Loan Agreement, dated as of the same date of the Note, between Senior Lender and Borrower (the "Senior Loan Agreement"). Pursuant to the Order and Decree of the United States Bankruptcy Court (the "Bankruptcy Court") approving Plan of Reorganization of Paradise Canyon, LLC, dated _____, 2003 (the "Confirmed Plan"), the Senior Note, Senior Loan Agreement and all other documents and instruments executed and delivered in connection with the same have been amended pursuant to that certain First Amendment to Loan Documents dated of even date herewith (the "Amendment"). The Amendment shall become effective upon execution and delivery of this Agreement by the parties hereto, and upon entry of the final Order of the Bankruptcy Court approving the Plan, at which time the Borrower shall be for purposes of this Agreement hereinafter referred to as the "Reorganized Debtor." The Loan and any extensions, amendments or substitutions thereof being herein referred to as the "Senior Loan."

B.    The obligations of the Borrower under the Senior Loan Documents are secured by that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated October 3, 2001, from Borrower, as Grantor, to Nevada Title Company, a Nevada corporation, as Trustee, for the benefit of Senior Lender, as Beneficiary (said Deed of Trust and any extensions, amendments, substitutions or consolidations thereof being referred to as the "Senior Deed of Trust"), encumbering the land located in Clark County, Nevada, legally described in Exhibit A attached hereto (the "Property"), as well as other property, including, but not limited to, all furniture, fixtures and equipment, whether now owned or hereafter acquired by the Borrower. The Senior Deed of Trust was recorded in the office of the Clark County Recorder on October 4, 2001 in Book 20011004 as Instrument Number: 01229. The Senior Loan Agreement, Senior Note, Senior Deed of Trust, Amendment and any extensions, amendments or substitutions thereof are hereinafter collectively referred to as the "Senior Loan Documents").

121069732v3 026

C.    Pursuant to the Plan, the Committee, as the official representative of all persons and/or entities holding Allowed Unsecured Claims, as such terms are defined in the Plan, is authorized to accept payments from the Reorganized Debtor under the Confirmed Plan of an aggregate sum to be determined following Plan confirmation, which payments represent the full and complete payment of all such claims, with such payments to be made over a period of no longer than sixty (60) months, without interest (the "Unsecured Creditors' Claims").

D.    The Unsecured Creditors' Claims shall be secured by a Second Priority Deed of Trust (the "Subordinated Deed of Trust") from the Reorganized Debtor, as Grantor, in favor of Nevada Title Company, as Trustee, for the benefit of the Subordinate Creditors, as Beneficiary (the "Subordinate Deed of Trust"), encumbering Property. As a condition to entering into the Amendment, Senior Lender has required that this Subordination Agreement be executed and delivered by the Committee on behalf of the Subordinate Creditors, whose authority for executing the referenced documents arises from the Reorganized Debtor's Confirmed Plan, and consented to by the Reorganized Debtor and the Bankruptcy Court pursuant to the Confirmed Plan.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

1.    The Unsecured Creditors' Claims, the Subordinate Deed of Trust and any other document evidencing, securing or guaranteeing or otherwise executed in connection with the Unsecured Creditors' Claims (collectively, together with any extensions, refinancings, modifications, substitutions or consolidations thereof, being hereinafter collectively referred to as the "Subordinate Unsecured Creditors' Claim Documents") and all advances made thereunder, are hereby, and shall continue to be, subject and subordinate to the lien of the Senior Loan, the Senior Loan Agreement, the Senior Note, the Senior Deed of Trust, the Amendment, and any other document evidencing, securing or guaranteeing the Senior Loan or otherwise executed in connection with the Senior Loan (collectively, together with any amendments, extensions, refinancings, modifications, substitutions or consolidations thereof, being hereinafter collectively referred to as the "Senior Loan Documents") and all advances made thereunder without regard to the application of such advances, together with all interest, prepayment premiums and all other sums due under the Senior Loan Documents.

2.    In addition, without limiting the foregoing, the Committee, on behalf of the Subordinate Creditors agrees that all rights of Subordinate Creditors under the Subordinate Unsecured Creditors' Claim Documents in and to the Property and the proceeds thereof (including assignments of leases and rents, issues and profits and the rights with respect to insurance proceeds and condemnation awards) shall be expressly subject and subordinate:

(a)    to the rights of Senior Lender in and to the Property and the proceeds thereof (including assignments of leases and rents, issues and profits and rights with respect to insurance proceeds and condemnation awards) on the terms set forth in the Senior Deed of Trust and the other Senior Loan Documents; and

2

(b)    to any and all advances made and other expenses incurred under, and as permitted in, the Senior Deed of Trust and the other Senior Loan Documents.

3.    The Committee, on behalf of the Subordinate Creditors, hereby agrees that, except as provided in Section 4 below, so long as any sum shall remain outstanding under the Senior Loan Documents:

(a)    Committee shall simultaneously send to Senior Lender due notice of all defaults for which Subordinate Creditors intend to pursue remedies under the Subordinate Unsecured Creditors' Claim Documents, as well as copies of all notices required to be delivered to the Reorganized Debtor under the Subordinate Unsecured Creditors' Claim Documents. Notice under the Subordinate Unsecured Creditors' Claim Documents shall not be deemed effective until such notice has been received by Senior Lender. Senior Lender shall have the right, but shall not have any obligation whatsoever, to cure any such default within thirty (30) days after the expiration of the applicable grace period permitted to Reorganized Debtor under the Subordinate Unsecured Creditors' Claim Documents;

(b)    Subordinate Creditors shall not, without the prior written consent of Senior Lender, which consent shall not be unreasonably withheld, take any Enforcement Action (hereinafter defined). For the purposes of this Agreement, the term "Enforcement Action" shall mean with respect to the Subordinate Unsecured Creditors' Claim Documents, the acceleration of all or any part of the indebtedness evidenced by the Subordinate Unsecured Creditors' Claim Documents, the obtaining of a receiver, the seeking of default interest, the taking of possession or control of the Property, the commencement of suit on any other obligation contained in the Subordinate Unsecured Creditors' Claim Documents, the exercising of any rights of set-off or recoupment, the commencement of any bankruptcy, reorganization or insolvency proceedings against the Reorganized Debtor under any federal or state law, or the taking of any other enforcement action of any kind against the Property;

(c)    In the event Subordinate Creditors receive any payment contrary to the terms of the Subordinate Unsecured Creditors' Claim Documents, the Plan or under this Agreement, by or on behalf of Reorganized Debtor, or of all or any part of the Property, assets or business of Reorganized Debtor or the proceeds thereof, in whatever form, then, and in any such event, any payment or distribution of any kind or character, whether in cash, property or securities which shall be payable or deliverable with respect to any or all of the Unsecured Creditors' Claims shall be paid forthwith or delivered directly to Senior Lender for application to the payment of the Senior Loan to the extent necessary to make payment in full of all sums due under the Senior Loan remaining unpaid after giving effect to any concurrent payment or distribution to Senior Lender. In any such event, Senior Lender may, but shall not be obligated to, demand, claim and collect any such payment or distribution that would, but for these subordination provisions, be payable or deliverable with respect to the Unsecured Creditors' Claims;

3

(d)    No Enforcement Action or any other action be taken that would terminate any leases or other rights held by or granted to or by third parties with respect to the Property other than in accordance with the Senior Deed of Trust;

(e)    (i) If, after the consent required under paragraph 3(b) above has been obtained, any action or proceeding shall be brought to commence an Enforcement Action, no portion of the rents, issues and profits of the Property shall be collected except through a receiver appointed by the court in which such action or proceeding is brought, after due notice of the application for the appointment of such receiver shall have been given to Senior Lender and the rents, issues and profits so collected by such receiver shall be applied first to the payment of maintenance of and taxes and insurance on the Property, and then to the payment of principal and interest due and owing on the Senior Deed of Trust prior to the payment, if any, of any principal or interest due and owing on the Subordinate Deed of Trust; (ii) if during the pendency of any such action or proceedings, an action or proceeding shall be brought by Senior Lender for the foreclosure of the Senior Deed of Trust and an application is made by Senior Lender for an extension of such receivership for the benefit of Senior Lender, all such rents, issues and profits held by such receiver as of the date of such application shall be applied by the receiver solely for the benefit of Senior Lender, and Subordinate Creditors shall not be entitled to any portion thereof until all sums due and owing pursuant to the Senior Deed of Trust have been paid in full and applied as aforesaid; and (iii) notice of the commencement of any action or proceeding by Subordinate Creditors shall be given to Senior Lender and true copies of all notices thereof and papers served or entered in such action shall be delivered to Senior Lender.

(f)    Subordinate Creditors shall not, without the prior written consent of Senior Lender, modify or amend any of the terms or provisions of the Subordinate Deed of Trust or other Subordinate Unsecured Creditors' Claim Documents, if such modification or amendment would (1) increase the then outstanding amount of the Unsecured Creditors' Claims, (2) increase the amount of the scheduled payments on the Unsecured Creditors' Claims, (3) reduce the term of the Unsecured Creditors' Claims, or (4) otherwise materially increase the obligations of Reorganized Debtor under the Subordinate Unsecured Creditors' Claims Documents;

(g)    After request by Senior Lender, Subordinate Creditors shall within ten (10) days furnish Senior Lender with a statement, duly acknowledged and certified setting forth the amount of the then outstanding Unsecured Creditors' Claims and any other sums due and owing thereunder, and whether any default exists under the Subordinate Unsecured Creditors' Claim Documents; and

(h)    To the extent any payment under the Senior Loan Documents (whether by or on behalf of Reorganized Debtor, as proceeds of security or enforcement of any right of set-off or otherwise) is for any reason repaid or returned to Reorganized Debtor or its insolvent estate, or avoided, set aside or required to be paid to Reorganized Debtor, a trustee, receiver or other similar party under any bankruptcy, insolvency, receivership or similar law, then the Senior Loan or part thereof originally intended to be satisfied shall

4

be deemed to be reinstated and outstanding to the extent of any repayment, return, or other action as if such payment had not occurred.

(i)     To the extent any payment under the Subordinate Unsecured Creditors' Documents (whether by or on behalf of Reorganized Debtor, as proceeds of security or enforcement of any right of set-off or otherwise) is for any reason repaid or returned to Reorganized Debtor or its insolvent estate, or avoided, set aside or required to be paid to Reorganized Debtor, a trustee, receiver or other similar party under any bankruptcy, insolvency, receivership or similar law, then the Senior Lender shall have no objection to the reinstatement of any such amount to the Unsecured Creditors' Claims.

4.      Notwithstanding the provisions of Paragraph 3 of this Agreement, until Senior Lender gives the Committee written notice (in the manner set forth below) of the occurrence of a default by Reorganized Debtor under the Senior Loan Documents, and provided that

(a)     there shall not then exist any breach of this Agreement by Subordinate Creditors that has not been waived, in writing, by Senior Lender,

(b)     at the time of the payment described below no default by the Reorganized Debtor exists and is continuing under the Senior Loan Documents,

(c)     the payment described below, if made, would not give rise to the occurrence of any default by the Reorganized Debtor under the Senior Loan Documents, and

(d)     none of the events described in Paragraph 3(c)(iv) has occurred,

Reorganized Debtor may pay to Subordinate Creditors, and Subordinate Creditors may accept from the Reorganized Debtor payments when due on the Unsecured Creditors' Claims.

5.      Senior Lender hereby consents to the Unsecured Creditors' Claims subject to the terms of this Agreement. This consent is limited to the Unsecured Creditors' Claims described above and shall not be deemed to (a) be a consent to any future encumbrances or to any modification not permitted in Paragraph 3(f), or any renewal, extension or increase, of the Subordinate Unsecured Creditors' Claim Documents, (b) be a waiver of any provision limiting or prohibiting further encumbrances contained in the Senior Deed of Trust, (c) be a consent to or waiver of any other term or condition of the Senior Deed of Trust or other Senior Loan Documents, or (d) prejudice any right or rights which Senior Lender may now or in the future have under or in connection with the Senior Deed of Trust or other Senior Loan Documents.

6.      Senior Lender further agrees as follows:

(a)     Senior Lender will simultaneously send to the Committee a copy of any notice sent by Senior Lender to Reorganized Debtor of any default for which Senior Lender intends to pursue its remedies under the Senior Loan Documents, provided that any failure by Senior Lender to provide such notice shall not effect the subordination and

5

standstill obligations of Subordinate Creditors hereunder, which shall remain in full force and effect notwithstanding any such failure to provide any such notice.

(b)     After request by the Committee or its assignee, Senior Lender shall within thirty (30) days furnish the Committee with a statement, duly acknowledged and certified, setting forth the original principal amount of the Senior Note, the unpaid principal balance, all accrued but unpaid interest and any other sums due and owing thereunder, the rate of interest, the monthly payments and whether any default exists under the Senior Loan Documents.

7.     Senior Lender, the Committee and Subordinate Creditors shall cooperate fully with each other in order to promptly and fully carry out the terms and provisions of this Agreement.     Each party hereto shall from time to time execute and deliver such other agreements, documents or instruments and take such other actions as may be reasonably necessary or desirable to effectuate the terms of this Agreement.

8.     No failure or delay on the part of any party in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.

9.     Each party hereto acknowledges that to the extent that no adequate remedy at law exists for breach of its obligations under this Agreement, in the event either party fails to comply with its obligations hereunder, the other party shall have the right to obtain specific performance of the obligations of such defaulting party, injunctive relief or such other equitable relief as may be available.

10.     Any notice or other communication to any party in connection with this Agreement shall be in writing and shall be sent by manual delivery, telegram, telex, facsimile transmission, overnight courier or United States mail (postage prepaid) addressed, at the address specified below the signatures below, or at such other address as such party shall have specified to the other party hereto in writing.  All periods of notice shall be measured from the date of delivery thereof if manually delivered, from the date of sending thereof if sent by telegram, telex or facsimile transmission, from the first business day after the date of sending if sent by overnight courier, or from four days after the date of mailing if mailed.  Either party may change its address for notices by a notice given not less than five (5) business days prior to the effective date of the change.

11.     In the event of any conflict between the provisions of this Agreement and the provisions of the Subordinate Unsecured Creditors' Claim Documents the provisions of this Agreement shall prevail.

12.     No person, including, without limitation, Reorganized Debtor, other than the parties hereto and their successors and assigns as holders of the Senior Loan Documents and the Subordinate Unsecured Creditors' Claim Documents shall have any rights under this Agreement.

13.     This Agreement may be executed in two or more counterparts each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

6

14.     No amendment, supplement, modification, waiver or termination of this Agreement shall be effective against a party against whom the enforcement of such amendment, supplement, modification, waiver or termination would be asserted, unless such amendment, supplement, modification, waiver or termination was made in writing signed by such party.

15.     In case any one or more of the provisions contained in this Agreement, or any application thereof, shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein, and any other application thereof, shall not in any way be affected or impaired thereby.

16.     This Agreement shall be construed in accordance with and governed by the laws of the State of Nevada.

17.     This Agreement shall bind and inure to the benefit of Senior Lender, the Committee and Subordinate Creditors and their respective successors, permitted transferees and assigns.

[SIGNATURE PAGE FOLLOWS]

7

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

SENIOR LENDER:

FIRST NATIONAL BANK

By_____

    Its_____

Address:
109 North St. Paul Avenue
Fulda, Minnesota 56131
Attention: Joseph E. Grandgeorge
Fax No. 507-425-2579

OFFICIAL   COMMITTEE   OF   UNSECURED
acting as agent and fiduciary
Subordinate Creditors

CREDITORS,
on behalf of the

By_____

    Its_____

Address:
Official Committee of Unsecured Creditors of Paradise Canyon, LLC
Schwartzer & McPherson Law Firm
Las Vegas, Nevada 89109
Attention: Jeanette E. McPherson, Esquire
Fax No. (702) 693-0122

[SIGNATURE PAGE TO SUBORDINATION AND STANDSTILL AGREEMENT]

8

STATE OF MINNESOTA    )
                      ) ss.
COUNTY OF _____  )

The foregoing instrument was acknowledged before me this ____ day of _____,
2003, by Joseph E. Grandgeorge, the President of First National Bank, a national bank, on behalf
of the bank.

STATE OF NEVADA       )
                      ) ss.
COUNTY OF CLARK       )

The foregoing instrument was acknowledged before me this ____ day of _____,
2003, by _____, the Chairman of the Official Committee of
Unsecured Creditors of Paradise Canyon, LLC, a Nevada limited liability company, and a
reorganized debtor under Chapter 11 of the United States Bankruptcy Code, on behalf of the
Reorganized Debtor.

This instrument was drafted by:

Hinshaw & Culbertson
222 South Ninth Street, Suite 3100
Minneapolis, MN 55402

[ACKNOWLEDGMENT PAGE TO
SUBORDINATION AND STANDSTILL AGREEMENT]

9

121069732v3 026

## CONSENT OF REORGANIZED DEBTOR

The Reorganized Debtor hereby consents to all of the terms of the foregoing Subordination and Standstill Agreement.

PARADISE CANYON, LLC

By _____

Its _____

**STATE OF NEVADA** )
                          ) ss.
**COUNTY OF CLARK** )

The foregoing instrument was acknowledged before me this _____ day of _____, 2003, by Douglas C. Clemetson, the Manager of Paradise Canyon, LLC, a Nevada limited liability company, on behalf of the company.

10

121069732v3 026

## EXHIBIT A

(Legal Description)

A - 1

121069732v3 026